IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHARLES HOFFMAN,                    )
                                    )
        Plaintiff,                  )
                                    )
            vs.                     )    Civil Action No. 07-28
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
        Defendant.                  )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Charles Hoffman and Defendant Michael J. Astrue, Commissioner of Social Security.  Plaintiff seeks review of a final decision by the Commissioner declining to waive repayment of disability income benefits ("DIB") which the Commissioner contends were paid in excess of the amounts to which Plaintiff was entitled under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  For the reasons discussed below, Plaintiff's motion is granted and Defendant's motion is denied.

### II.   BACKGROUND[1]

Plaintiff Charles Hoffman was born on January 28, 1941.  He was diagnosed with moderate to severe mental retardation as a child and began living in a state residence when he was 17.  At

---

[1]  Neither party appears to dispute the accuracy of the facts set forth in this section.

approximately age 27, he entered another state facility which had a training program for basic work skills. Through that program, Mr. Hoffman was trained as a dishwasher and engaged in five to six months of seasonal work at various resort hotels every year from 1970 to 2002. While at a resort, he received room and board and other forms of support such as medical care, transportation, shopping for personal needs, etc., paid for by a Pennsylvania state work placement program; at other times, the state facility where he lived received Social Security disability payments on his behalf, first through his deceased father's coverage, then intermittently through his own coverage when he was unable to work. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 6, "Tr.," 109.) At all times, Joseph Kirby, Plaintiff's personal representative,[2] kept the Social Security Administration ("SSA") aware of Mr. Hoffman's work status and managed his benefits for him.

During the summers of 1992 and 1993, Mr. Hoffman participated in a nine-month trial work period ("TWP.") In a letter dated June 17, 1994, in which the SSA explained the TWP, Mr. Hoffman was advised that he would continue to receive benefits if he were disabled and his average earnings were not over $500 a month. (Tr.

---

[2] Although not discussed in the Administrative Law Judge's opinion, the appointment of Mr. Kirby as Mr. Hoffman's representative appears to be consistent with 20 C.F.R. § 404.2010(a)(1) which permits benefits to be paid to a representative payee when the SSA has been informed that a beneficiary more than 18 years old is "legally incompetent or mentally incapable of managing benefit payments."

2

15.) He continued to receive DIB payments on a regular basis thereafter.

In November and December 1997, Mr. Hoffman received letters from the SSA indicating his benefits had been overpaid from April through October 1994 due to his summer income. Consequently, the SSA proposed to withhold part of his disability payments for 14 months as reimbursement, a plan Mr. Hoffman did not protest.[3] (Tr. 121-122.) Mr. Hoffman received two more letters in April 1998 stating he was not entitled to benefits from March through September 1994, July through October 1995, and June 1996 "and later" (Tr. 124-126; 16-17), however, he was not told the amount of these alleged overpayments nor did the SSA acknowledge that part of his monthly benefit was already being withheld to reimburse payments from the overlapping period of April through October 1994.

In July 1998, Mr. Hoffman received yet another letter, indicating he had been overpaid $15,590.10 for the periods March 1994, July-October 1995, June-November 1996, December 1996-November 1997, and December 1997-June 1998.[4] (Tr. 11.) Based on his own records, Plaintiff disagreed that he owed this amount and asked for an explanation, appearing in person at the Johnstown, Pennsylvania,

---

[3] Throughout this opinion, the Court has described certain actions as having been taken by Mr. Hoffman as claimant. In reality, Mr. Kirby took these actions on Mr. Hoffman's behalf inasmuch as he could not do so himself due to his mental impairments.

[4] The three contiguous periods between June 1996 and June 1998 were identified separately because the disability payments were different amounts in each of the three periods.

3

office of the SSA where he was told "they would follow through and try to find out what was going on." (Tr. 171.) He was advised on February 8, 1999, that the SSA would contact him "later" about his request. (Tr. 131.) On March 11, 1999, Mr. Hoffman received a letter stating:

> We paid you $22,810.00 for January 1991 through December 1995. Since we should have paid you $7,220.00 for January 1991 through December 1995, we paid you $15,590.00 more than you were due.

(Tr. 132.) The letter did not explain the inconsistencies between this information and the prior letters which had described the overpayments as arising from March 1994 through June 1998 and did not discuss reimbursement. Mr. Hoffman received no further communications from the SSA regarding the alleged overpayments for more than four years.

After he was laid-off from his resort job on October 17, 2002, Mr. Hoffman was no longer able to find comparable work. (Tr. 50.) He filed an application to be reinstated for disability benefits on November 8, 2002. (Tr. 38-43, 45.) Because he was age 61 at the time, the SSA determined that he was eligible to receive retirement benefits instead. Although these benefits began in February 2003, as of April 2003, for reasons which are unclear from the record, the SSA returned him to the disability insurance program. (Tr. 53.) The SSA again notified him that his benefits would be stopped in order to collect the alleged 1994-1998 overpayments. Between March 3, 2003, and December 1, 2005, Mr. Hoffman received at least

4

16 letters from the SSA, variously stating the amount due as ranging from $15,590 to $13,778.10 as a result of overpayments in various periods from March 1994 through June 1998.

Mr. Hoffman sought a waiver of the overpayment on September 8, 2004. (Tr. 60-67.) Pursuant to SSA policies, Plaintiff also requested that the SSA stop its collection of the alleged overpayment by withholding his monthly benefits until a decision had been made on his request for a waiver.

On July 26, 2005, a personal conference was held between Mr. Kirby and a representative of the SSA. Mr. Kirby was advised that his request for a waiver of repayment had been denied and, consequently, all benefits would cease as of September 2005 until such time as the balance of the overpayment, then calculated at $13,778.10, had been repaid. (Tr. 70-71.)

On August 17, 2005, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") to reconsider the denial of the waiver. (Tr. 83.) The hearing was held on June 19, 2006 before the Honorable Raymond J. Zadzilko who issued his decision on September 27, 2006, affirming denial. (Tr. 24-28.) Although Mr. Hoffman timely filed a request for review of Judge Zadzilko's decision (Tr. 6), the Social Security Appeals Council found no reason pursuant to its rules to do so. (Tr. 2-5.) Therefore, the September 27, 2006 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h);

5

Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff, acting *pro se* through his representative Mr. Kirby, filed suit in this Court on February 2, 2007, seeking judicial review of the ALJ's decision.

## III.   JURISDICTION

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## IV.   STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id.

6

at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.)  If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## V.   **LEGAL ANALYSIS**

### A.   The ALJ's Analysis

The ALJ correctly identified the issue before him as the two-prong analysis applied in cases where a Social Security benefits recipient has allegedly been overpaid.  According to Social Security regulations, the first question is whether the claimant was "without fault" - as that phrase is defined in 20

7

C.F.R. § 404.507 – in causing the overpayment. If the claimant was without fault, the second question is whether recovery of the overpayment would either "defeat the purpose" of Title II of the Social Security Act, as defined in 20 C.F.R. § 404.508, or run counter to "equity and good conscience," as defined in 20 C.F.R. § 404.509. (See ALJ's opinion at Tr. 24.) Waiver of the demand for reimbursement of an overpayment is permitted only if (1) the recipient is without fault **and** (2) repayment would deprive him of funds needed for ordinary and necessary living expenses or would otherwise be inequitable. (Tr. 24-25.)

As to the first prong of the waiver test, Judge Zadzilko found that Mr. Hoffman was without fault in causing the overpayment. (Tr. 26.) However, with regard to the second prong, the ALJ concluded that the SSA had acted properly in declining to waive reimbursement. Because Mr. Hoffman had assets of $43,836.86 in the form of a certificate of deposit and a savings account, he had the ability to reimburse the government for the overpayment without unduly depriving himself of funds needed for ordinary and necessary living expenses. The ALJ further rejected Mr. Hoffman's argument that these funds were needed in order for him to retain his independence and financial security during his retirement rather than being forced by poverty to return to institutional living. While he found this concern understandable, he noted that the Social Security Act did not contain provisions to insure that a

claimant had long-term financial security and that even after the overpayment was reimbursed, Mr. Hoffman's assets would be above the minimum amount permitted by law for a person without dependents, i.e., $3,000.[5]   Thus, compelling reimbursement would not "defeat the purpose" of the Social Security Act.   (Tr. 26.)

Alternatively, the ALJ found that reimbursement would not be against equity and good conscience because (1) there was no clear evidence to support Mr. Kirby's argument at the hearing that Mr. Hoffman would have applied for state funds to pay for his room and board expenses had he known he was not entitled to DIB, and (2) by Mr. Kirby's admission, Mr. Hoffman would still remain financially independent for at least three years after reimbursing the SSA in full.   Finally, the ALJ rejected Plaintiff's argument that he had changed his financial circumstances for the worse by retiring.   He noted that Mr. Hoffman had stopped working because his subsidized

---

[5]   Although the ALJ does not identify the source for applying a limit of $3,000 to Mr. Hoffman's assets which would remain after repayment, it appears to originate in the SSA's Program Operations Manual System ("POMS"), section GN 02250.100(A).   That section explains that "recovery will defeat the purpose of title II to the extent that the person . . . needs substantially all current income to meet ordinary and necessary living expenses" and recovery would reduce his remaining assets below $3,000 "for a person with no dependents." The Third Circuit Court of Appeals has noted that POMS does "not have the force of law."   See Edelman v. Commissioner of Social Sec., 83 F.3d 68, 71 n.2 (3d Cir. 1996), citing Schweiker v. Hansen, 450 U.S. 785, 789 (1981); see also Hirschfeld v. Apfel, 159 F. Supp.2d 802, 812, n.6 (E.D. Pa. 2001), citing Edelman and Schweiker.   Compare, however, Washington State Dept. of Soc. & Health Servs. v. Guardianship Estate of Keffeler, et al., 537 U.S. 371, 385-386 (2003), noting that although the "administrative interpretations" in POMS are not the product of formal rulemaking, "they nevertheless warrant respect."

employment ended, not because of his dependence on DIB or because of any action by the SSA.   Moreover, he had received only two retirement benefit payments before being reinstated to DIB beginning in April 2003.   (Tr. 26.) Therefore, although he was without fault, in light of Mr. Hoffman's ability to repay and the lack of any persuasive argument that repayment would otherwise be inequitable, the ALJ denied his request for waiver.   (Tr. 27.)

Having considered the ALJ's analysis, together with the relevant law and the facts and circumstances of this case, we find the ALJ erred by concluding recoupment from Mr. Hoffman would not be against equity and good conscience.

B.   Analysis of Plaintiff's Arguments

As noted above, Mr. Kirby elected to proceed without legal representation on behalf of Mr. Hoffman.   As a pro se litigant, his arguments are to be construed liberally by this Court.   Haines v. Kerner, 404 U.S. 519, 520 (1972) (pleadings of a pro se complainant are to be held to "less stringent standards than formal pleadings drafted by lawyers"); Zappala v. Barnhart, No. 05-5252, 2006 U.S. App. LEXIS 24880, *3, n.1   (3d Cir. Aug. 18, 2006).   We turn to each of his arguments as discussed in the Complaint itself and in his brief in support of his motion for summary judgment (Doc. No. 9, "Plf.'s Brief.")

1.   *Inaccuracy in Overpayment Determination:*   At the hearing, Mr. Kirby summarized the various statements he had

10

received from the SSA between November 9, 1997, and August 10, 2005, regarding the amount of the alleged overpayment. He concluded when he considered the whole record, he was led to believe that "there's enough inconsistency and discrepancy of actual monies received to question the overpayments validity." (Tr. 172.)  He later added, "I find it difficult to understand these discrepancies. . . .Because I can't figure this out, I'm questioning the overpayment."  (Tr. 175.)

In his opinion, the ALJ failed to arrive at any calculation of the total amount of overpayments. He acknowledged Plaintiff's argument on this point, but concluded that the

> overpayment has been adjusted on several occasions, specially when retroactive benefits have been used to reduce his liability or he has made refunds toward payment of his overpayments. In addition, he has had more than one overpayment since April 1982 [sic]. The differing amounts reflect these adjustments and are not errors in the computation.

(Tr. 25.)

The Commissioner of Social Security is compelled by law to recover funds paid to a claimant to which he is not entitled. 42 U.S.C. § 1383(b)(1). However, the Social Security Act does not indicate which party bears the burden of proving the fact and amount of overpayment. The United States Court of Appeals for the Third Circuit, along with the two other circuit courts of appeal which have considered this question, has concluded that the Commissioner has this burden. <u>Cannuni on behalf of Cannuni v.</u>

11

Schweiker, 740 F.2d 260, 263 (3d Cir. 1984) ("when the government seeks to recover an alleged overpayment, it must demonstrate that the claimant was not entitled to the Social Security funds"); *see also* McCarthy v. Apfel, 221 F.3d 1119, 1124 (9th Cir. 2000), *cert. denied*, 532 U.S. 923 (2001), and United States v. Smith, 482 F.2d 1120, 1124 (8th Cir. 1973), as well as district courts in Morency v. Bowen, 677 F.Supp. 260, 262 (D. N.J. 1988); United States v. Taghizadeh, 98 F. Supp.2d 1269, 1273 (D. Kan. 2000); Pennerman v. Apfel, CA No. 99-3244, 2001 U.S. Dist. LEXIS 6255, *10 (E.D. N.Y. Apr. 18, 2001); Wilkening v. Barnhart, CA No. 02-9096, 2004 U.S. Dist. LEXIS 7298, *15 (N.D. Ill. Apr. 27, 2004); and Nadeau v. Barnhart, CA No. 05-20, 2006 U.S. Dist. LEXIS 2153, *13 (D. N.H. Jan. 19, 2006), all *citing* Cannuni for this principle. The Commissioner's burden in this regard has three elements, that is, he must show: (1) the recipient actually received the benefits for a specific period; (2) the benefits were in excess of the amount to which he was entitled; and (3) the amount of the overpayment. McCarthy, id. Plaintiff does not dispute the first element.

At various times between November 1997 and August 2005, Mr. Hoffman's overpayment was calculated as low as $3,136.70 and as high as $15,590.00. (*See* summary table in the margin, setting out in chronological order the periods and amounts of alleged

12

overpayments, footnote [6].)  The latter number was first described
on July 20, 1998, as the sum of overpayments in specific amounts
for the periods March 1994, July through October 1995, and June
1996 through June 1998.   (Tr. 11.)   However, by the Court's
calculation, using the dates and amounts in that letter, the total

---

[6]

| Date | Tr. | Period of Alleged Overpayment | Amount Due |
|---|---|---|---|
| November 9, 1997 | 121 | April - Oct. 1994 = 7 mo. @ $448.10/mo | $3,136.70 |
| April 8, 1998 | 124-126 | March - Sept. 1994<br>July - Oct. 1995<br>June 1996 "and later" | Not stated |
| July 20, 1998 | 11 | March 1994 = 1 mo. @ $448.10<br>July  - Oct. 1995 = 4 mo. @ $460.10<br>June - Nov. 1996 = 6 mo. @ $472.50<br>Dec. 1996 - Nov. 1997 = 12 mo. @ $485.80<br>Dec. 1997 - June 1998 = 7 mo. @ $495.80 | $15,590.10<br>(by Court's calculation =<br>$14,423.70) |
| March 11, 1999 | 132 | Jan. 1991 - Dec. 1995 | $15,590.00 |
| March 19, 2003 | 53 | Not stated | $15,590.00, less $458.00<br>retirement benefit<br>recouped  = $15,132.00 |
| May 20, 2003 | 136 | Not stated | $15,066.00 |
| December 1, 2003 | 137 | Not stated | $15,066.00 |
| February 13, 2004 | 138 | Not stated | $13,778.10 |
| August 8, 2004 | 56 | Mar. - May 1996<br>June - Sept. 1996<br>(monthly amounts not stated in letter; as per<br>information at Tr. 11 = 7 mo. @ $472.50) | Not stated;<br>(by Court's calculation =<br>$3,307.50) |
| September 30, 2004 | 143 | Not stated | $13,778.10 |
| July 26, 2005 | 70 | Mar. 1994 = 1 mo. @ $448.10<br>July - Oct. 1995 = 4 mo. @ $460.10<br>June - Sept. 1996 = 4 mo. @ $472.50<br>(monthly amounts not stated in letter but<br>consistent with Tr. 11) | $15,590.10 – original<br>balance;  $13,778.10 –<br>current balance<br>(by Court's calculation =<br>$4,178.50) |
| August 5, 2005 | 151 | Not stated | $13,778.10 |
| August 10, 2005 | 75-76 | Mar. 1994 = 1 mo. @ $448.10<br>July  - Oct. 1995 = 4 mo. @ $460.10<br>June - Nov. 1996 = 6 mo. @ $472.50<br>Dec. 1996 - Nov. 1997 = 12 mo. @ $485.80<br>Dec. 1997 - June 1998 = 7 mo. @ $495.80 | $15,590.00 -- original<br>balance;  $13,778.10 –<br>current balance |

is only $14,423.70.   On March 11, 1999, the $15,590 amount was described simply as the difference between the benefits that were paid and the benefits that should have been paid between January 1991 and December 1995. (Tr. 132.)   Since the record shows that Mr. Hoffman did not begin receiving disability benefits on his second application until April 1992 (Tr. 117) and that he performed a trial work period in 1992 and 1993 when the SSA concluded he was entitled to benefits because he did not engage in "substantial work"[7] (Tr. 14-15), this vague approximation cannot be considered substantial evidence of specific amounts which were overpaid for specific periods.   On July 26, 2005, a letter from the SSA states that the overpayment of $13,778.10 resulted from benefits erroneously paid in March 1994, July through October 1995, and June through September 1996.   (Tr. 70.)   Although this letter did not state the amount of the overpayment for each month, using the amounts stated in the July 20, 1998 letter, the Court's calculation shows that the alleged overpayment for this period totals $4,178.50, not $13,778.10.

The ALJ never identified which, if any, of these proposed amounts represented the amount Mr. Hoffman was allegedly overpaid, nor did he attempt to explain the discrepancies in the periods of

---

[7]   Social Security regulations define "substantial gainful activity" as work activity that involves doing significant physical or mental activities, even if done on a part-time basis, and done for pay or profit, whether or not a profit is realized.   See 20 C.F.R. § 404.1572(a), (b).

overpayment. Thus, at least two of the three parts of the Commissioner's burden as described in McCarthy, *supra*, were omitted from his analysis.

Moreover, although the ALJ concluded that the adjustments were the result of credits against the total overpaid when the SSA withheld all or part of a monthly payment to which he was legitimately due, the Court has been unable to confirm this conclusion. On November 9, 1997, Mr. Hoffman was told he had been overpaid for the period April through October 1994 in the amount of $3,136.70. (Tr. 121.) He was advised on December 24, 1997, that the SSA would withhold $261 each month for the period January 1998 through February 1999 in order to recoup this amount[8] and he would receive $191 per month. (Tr. 122-123.) Mr. Kirby testified that although these withholdings were made in January through June of 1998 (Tr. 174), DIB payments stopped entirely, without explanation, as of July 2, 1998. (Plf.'s Brief at 2.) If this is true (and there is no evidence to show otherwise), Mr. Hoffman reimbursed the SSA for benefits paid between April and October 1994 by $1,566.00, leaving a balance of $1,570.70.[9] Nor is overpayment for the period

_____

[8] The Court notes that had the SSA actually withheld this amount per month for the period January 1998 through February 1999, it would have recouped $3,654.00, or $517.30 more than it allegedly had overpaid.

[9] Plaintiff filed an attachment to his motion for summary judgment in the form of records from the SSA prepared on January 19, 2007, showing that payments made to the SSA in 1998 totaled $1,970.30, $404.30 more than the amount Mr. Kirby testified had been withheld. (Doc. No. 8 at 1.) This document was not in the record before the ALJ

15

April through October 1994 mentioned in any of the later calculations by the SSA. (Tr. 11 and 75-76.) That is, the later correspondence refers only to an alleged overpayment occurring in March 1994, another inconsistency which is never explained.

Not having received any explanation of these discrepancies from the Commissioner in his brief in support of the motion for summary judgment, the Court discovered by pure chance that $15,590, the figure which seems to be most frequently cited by the SSA as the amount of overpaid benefits, is the difference between the amount withheld from Mr. Hoffman's benefit payments between January and June 1998, $1,566, and $17,156, the amount shown in a computer-generated report dated March 3, 2006. (See Tr. 100-104.) How the original amount of $17,156 was determined as of November 5, 1997, is not explained in the report.[10] To the best of our ability to discern from the record, however, Mr. Kirby was never told at any time between November 1997 and August 2005 that the total

_____

and cannot be considered by this Court. Matthews v. Apfel, 239 F.3d 589, 594 (3d Cir. 2001) (evidence not presented to the ALJ "cannot be used to argue that the ALJ's decision was not supported by substantial evidence.") However, upon remand for calculation of the amounts to be refunded to Plaintiff, this report should be taken into account.

[10] We find the total calculated as of this date does little or nothing to clear up the confusion as to the alleged amounts and dates of overpayment. If Mr. Hoffman had been overpaid $17,156 as of November 5, 1997, it seems impossible that the same precise total could result from overpayments which allegedly occurred from December 1997 through June 1998 as stated in the letter of July 20, 1998. (Tr. 11.) Nor does it seem plausible that it would correspond precisely to overpayments alternatively alleged to have occurred from January 1991 through December 1995 as he was advised on March 11, 1999. (Tr. 132.)

16

overpayment on which the SSA based its calculation was $17,156.

We conclude that the amount of the overpayment has not been established by substantial evidence. Usually, this lack of precision would be sufficient cause to remand to the Commissioner for determination of exactly what amounts Mr. Hoffman was paid and when, along with a clear explanation of why those payments were made in error. *See* Sturdevant v. Celebrezze, 239 F.Supp. 745, 747 (E.D. Pa. 1965), remanding for further proceedings where record was incomplete as to precise method and mathematical calculations used in reaching the final determination of the amount of retirement benefits to be reimbursed. However, because we conclude denial of a waiver of reimbursement would be against equity and good conscience, we need not remand on this basis.

2. *Recoupment Should Be Waived:* Although the Commissioner is charged with the responsibility to recoup benefits which were improperly awarded, there are certain circumstances set out in the Social Security Act in which such recoupment may be waived. The individual seeking waiver of recovery "bears the burden of establishing that he has met the requirements of § 404(b) of the Social Security Act." Banuelos v. Apfel, 165 F.3d 1166, 1170 (7th Cir. 1999), *overruled on other grounds* by Johnson v. Apfel, 189 F.3d 561, 562 (7th Cir. 1999).

As the ALJ discussed, analysis of the recoupment issue begins with the claimant first establishing that he was "without fault"

17

for receiving the overpayment.   20 C.F.R. § 404.506.   The individual must show that the overpayment did not result from (1) a statement he made which he knew or should have known to be incorrect; (2) his failure to furnish information which he knew or should have known to be material; or (3) his acceptance of a payment which he knew or could have been expected to know was improper.   20 C.F.R. § 404.507.   "In determining whether an individual is at fault, the [SSA] will consider all pertinent circumstances, including the individual's age and intelligence, and any physical, mental, educational, or linguistic limitations . . . the individual has."   Id.

In this case, both the Social Security Administration and the ALJ concluded that Mr. Hoffman and his personal representative were entirely without fault.   (See Tr. 71 and 26.)   Therefore, this Court need only consider only the second prong of the waiver test where the burden is on the claimant to establish that recovery would either (1) defeat the purpose of Title II or (2) be against equity and good conscience.   Marchese v. Secretary of Health & Human Services, 690 F.Supp. 162, 163 (W.D. N.Y. 1988).   The provisions of the statute, 42 U.S.C. § 404(b), are mandatory; that is, recoupment of overpayment must be waived if the claimant meets the Act's requirements.   Califano v. Yamasaki, 442 U.S. 682, 693 n.9 (1979), describing as "mandatory" the language stating "there shall be no adjustment of payments to, or recovery by the United

18

States" when waiver is proper.

a.   Recoupment would "defeat the purpose" of the Social Security Act when it would "deprive a person of income required for ordinary and necessary living expenses." 20 C.F.R. § 404.508.   This portion of the analysis requires the adjudicator to determine if the individual has "income or financial resources sufficient for more than ordinary and necessary needs, or is dependent upon all of his current benefits for such needs."   Id. If the person "needs substantially all of his current income (including social security monthly benefits) to meet current ordinary and necessary living expenses," recovery must be waived. Id.   The recipient's entire financial picture – current income and other monetary resources   – must be considered in making this determination.   See cases in which the courts decided recovery would not defeat the purpose of the Act after considering the recipient's total financial condition, e.g., Banuelos, 165 F.3d at 1171 (recipient had assets totaling approximately $116,000, including loans, cars, a certificate of deposit, several bank accounts, and equity in a house in Mexico); Milton v. Harris, 616 F.2d 968, 973-974 (7th Cir. 1980) (recipient had established her own business, held savings of over $40,000 and real estate worth $17,000, received $3,500 per year in interest income, and earned $200 per month); and Newton v. Chater, No. 94-36144, 1996 U.S. App. LEXIS 30277, *2-*3 (9th Cir. Nov. 19, 1996) (recipient had liquid

19

assets of over \$7,000 and equity of at least \$16,000 in real property other than his primary residence.)

According to a Request for Waiver of Overpayment Recovery updated by Mr. Kirby on July 26, 2005, Plaintiff's average monthly expenses at that time totaled \$1,285, approximately \$640 more than the amount of his monthly DIB payments. (Tr. 66.) The parties agree Mr. Hoffman has accumulated liquid assets of almost \$44,000 which he uses to cover the monthly shortfall. Mr. Kirby testified that the purpose of these savings was to allow Mr. Hoffman to maintain a quasi-independent life style, that is, rather than living in a state facility for the mentally retarded, he is able to live in a "hotel" where a friend provides assistance with activities of daily living, meals, and clothing. (Tr. 179.) According to Mr. Kirby's calculations, with his savings and DIB, Mr. Hoffman should be able to "cling to his independence, Spartan as it may be" (Plf.'s Brief at 3), for approximately 10 years, an ability which is very important to him. (Tr. 176-177.)

Defendant argues that these savings were accomplished only through overpayment of benefits and that "Plaintiff cannot prevail simply because he believes he should retain the overpaid funds for his own future use." (Defendant's Brief in Support of His Motion for Summary Judgment, Doc. No. 13, "Def.'s Brief," at 19.) Regardless of whether one believes Mr. Hoffman's savings resulted from his frugal life style or from overpayment of benefits, we must

20

agree that case law supports the conclusion that where the recipient has liquid assets upon which he can draw to supplement any shortfall between his Social Security benefits and his reasonable monthly expenses of living, recoupment would not defeat the purpose of the Act unless doing so would reduce the recipient's remaining assets below $3,000. *See* Banuelos, Milton, and Newton, *supra.* We turn, therefore, to the alternative basis for waiver.

b. Recovery may also be waived where recoupment would be "against equity and good conscience." 20 C.F.R. § 404.509. That phrase is not defined in the Social Security Act, and the regulations provide only that recovery of an overpayment will be considered against equity and good conscience where "an individual changed his or her position for the worse . . . or relinquished a valuable right . . . because of reliance upon a notice that a payment would be made or because of the overpayment itself." 20 C.F.R. § 404.509(a)(1). The individual's financial circumstances are not material to this analysis. 20 C.F.R. § 404.509(b).

As an example of changing one's position for the worse, the SSA hypothesizes a widow who enrolls her child in a private school in reliance on Social Security survivors benefits, only to learn later that her husband was not covered by the program. Because she has committed to pay the tuition for the private school and has no other funds from which to pay those expenses, her position has

21

become worse than it would be if benefits had not been promised. Similarly, an individual who retires, expecting to rely on Social Security income only to learn later that he did not have sufficient working time for full benefits, has relinquished a valuable right when he is unable to find other work.  Thus, in either case, recoupment would be against equity and good conscience.

To date, the Third Circuit Court of Appeals has not spoken on the question of how broadly the phrase "against equity and good conscience" should be interpreted.[11]  Two other circuit courts which have considered this question, however, have concluded that a narrow reading of the phrase is inconsistent with Congressional intent as reflected in the legislative history of the statute.  In Groseclose v. Bowen, 809 F.2d 502 (8th Cir. 1987), the SSA attempted to recoup benefits erroneously paid directly to the claimant's daughter after she was no longer a full-time student.  The plaintiff testified at the ALJ's hearing that he was unaware of the

---

[11]  In Serrant v. Virgin Islands Empl. Sec. Agency, 57 F.3d 334 (3d Cir. 1995), Judge Becker parsed identical language in a Virgin Islands employment statute, 224 V.I.C. § 305(j)(2).  The Court acknowledged that like the Social Security regulation, the statute did not define "equity and good conscience," and relied on similar provisions in other jurisdictions which made clear that the phrase relates "to the ability of the recipient to repay the debt without experiencing hardship."  Id. at 337-338.  Since SSA regulations provide a broader range of reasons involving detrimental reliance which the Court was not required to consider in Serrant, we find its discussion of the phrase of little applicability here.  See also Elshinnawy v. Comm'r of SSA, No. 06-2056, 2007 U.S. App. LEXIS 14784 (3d Cir. June 21, 2007), not reaching this issue because the court concluded at step one of the analysis that the plaintiff was not without fault.

payments and did not know if his daughter had been enrolled in school at the time because she was living in another state.  Id. at 503-504.

On appeal from the district court's decision affirming the ALJ's conclusion that recoupment would not be against equity and good conscience, the United States Court of Appeals for the Eighth Circuit acknowledged that "an agency's interpretation of the statute that it is charged with administering is entitled to considerable deference," but also noted that "this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history." Groseclose, id. at 505, quoting Southeastern Community College v. Davis, 442 U.S. 397, 411 (1979) (other citations and quotations omitted.)  The Court continued:

> The source of the [Commissioner's] interpretation of "against equity and good conscience" is unclear.  The narrow interpretation is not necessarily supported by the Act or its legislative history, nor is it supported by the ordinary meaning of the phrase. . . .Unless otherwise defined, statutory words will be interpreted as taking their ordinary, contemporary, common meaning.  The term equity denotes the spirit and habit of fairness and justness.  The term conscience means the sense of right or wrong. . . together with a feeling of obligation to do or be that which is recognized as good. . . . "[A]gainst equity and good conscience" is language of unusual generality. . . .[which] necessarily anticipates that the trier of fact, instead of attempting to channelize his decision with rigid and specific rules, will draw upon precepts of justice and morality as the basis for his ruling.

Groseclose, 809 F.2d at 505 (citations and quotations omitted.)

The Court went on to point out that although the legislative history of the statute did not define the phrase, the fact that Congress intended to make recovery more equitable than proposed in the regulations is reflected in the existence of the waiver provision itself. Id. at 505-506 (citations omitted.)  In holding that recoupment would be against equity and good conscience "as that phrase is commonly understood," the Court concluded:

Notwithstanding the deference given to administrative interpretations, we believe that the [Commissioner's] definition of "against equity and good conscience" is unreasonably narrow. It cannot be said that the relinquishment of a valuable right and the changing of one's position for the worse represent the only circumstances in which recoupment would be inequitable.

Id. at 506.[12]

Three years later, the Ninth Circuit concurred with this reasoning in Quinlivan v. Sullivan, 916 F.2d 524 (9th Cir. 1990). The plaintiff was incarcerated in 1963 on a felony conviction and began receiving disability benefits after being diagnosed with schizophrenia. In 1980, the law was changed to prohibit payment to incarcerated felons, but Quinlivan continued to receive benefits. In early 1982, when he became aware of this change, he immediately contacted the SSA, at which point the Administration stopped providing benefits and demanded repayment.  Quinlivan sought a

---

[12]  Following the decision in Groseclose, the SSA amended the regulation to include as a third example the facts from this case, that is, recoupment may be waived where the recipient of the benefits resides in a different household and the other party is unaware that he or she is receiving them.  20 C.F.R. § 404.509(a)(2).

waiver of the two-year overpayment, but the situation was never resolved. When the plaintiff was released from prison in 1985, he spent his accumulated savings, including the overpayment. He did not receive disability benefits after his release because a continuing disability review showed he was no longer disabled. In 1987, the SSA rejected his request for reconsideration of the waiver denial, a decision which was affirmed through the appeals process to the district court level. Quinlivan, 916 F.2d at 525-526.

The Court of Appeals reversed, holding that repayment would be against equity and good conscience. Following the analysis applied in Groseclose and noting that the legislative history indicated that Congress modeled the waiver provision after identical language in the law pertaining to recoupment of overpayments by the Veterans Administration, the Court concluded it was "not bound by the [Commissioner's] interpretation where the regulation limiting the meaning of the phrase has no foundation in the statute or its legislative history." Id. at 526-527 and n.2, noting that the Veterans Administration applied the equity and good conscience standard "when the facts and circumstances indicate a need for reasonableness and moderation in the exercise of the Government's rights." The Court concluded,

> the meaning of the phrase, "against equity and good conscience," cannot be limited to the three narrow definitions set forth in the Secretary's regulation. Congress intended a broad concept of fairness to apply to

25

waiver requests, one that reflects the ordinary meaning of the statutory language and takes into account the facts and circumstances of each case. Denial of Quinlivan's waiver request is inconsistent with the equitable principles expressed in the statute and its history. . . .We emphasize that our interpretation of the equity and good conscience standard does not mean that whenever an individual is found to be without fault, it necessarily follows that waiver is appropriate. This approach would render superfluous the "without fault" provision, a threshold requirement of the statute. Instead, we believe courts must apply cautiously the equity and good conscience standard to the circumstances of each case.

Id. at 527.

In applying this standard, the Court noted that Quinlivan had no material goods, no means of transportation, and no income when he was released from prison. He had only worked in a few temporary jobs, apparently because of a psychological impairment as well as physical factors. Given these circumstances, the Court found it would be against equity and good conscience to require repayment. Id. at 527.

Other courts have similarly found recoupment to be against equity and good conscience in a variety of circumstances. *See,* e.g., Green v. Secretary of Health, Education & Welfare, 218 F.Supp. 761 (D. D.C. 1963), where the plaintiff disclosed that she worked one hour four days a week and two hours one day a week, thereby violating a restriction of working seven calendar days or less per month, the Administration's failure to act promptly during a three-year period deprived her of the right to choose intelligently among various alternatives, e.g., increasing work,

26

consolidating hours on fewer days, or not working at all; Valente
v. Secretary of Health & Human Services, 733 F.2d 1037 (2d Cir.
1984), remanding for clarification, in part because it appeared
recipient had taken out a loan to pay child's college tuition,
relying on disability benefits to make loan payments; (Robin) Adams
v. Secretary of Health & Human Services, 653 F.Supp. 249 (C.D.
Ill. 1986), finding inequitable any recoupment from woman who
relinquished her right to obtain child support directly from her
ex-husband and accepted Social Security checks in lieu thereof;
(Helen) Adams v. Secretary of Health & Human Services, 889 F.2d
1086 (6th Cir. 1989), where it would be inequitable to demand
repayment from woman whose adult son, living in another household,
received benefits erroneously while working; Fremont v. Sullivan,
No. 90-56076, 1992 U.S. App. LEXIS 6512 (9th Cir. Apr. 7, 1992),
equity better served by waiver of recoupment from an elderly couple
living on a fixed income who received minimal excess benefits over
a period of years, in part due to an error by the SSA, despite the
fact that they had other income, a savings account, and a long-term
certificate of deposit; Villate v. Sullivan, 862 F.Supp. 514 (D.
D.C. 1994), recoupment precluded where, *inter alia*, the plaintiff
reported another source of pension benefits to SSA, but SSA
provided unclear, inconsistent and confusing information and failed
to ascertain the accuracy of the pension information she provided;
Harzewski v. Chater, 977 F.Supp. 217 (W.D. N.Y. 1997), where

27

recovery would come from personal funds of deceased recipient's personal representative inasmuch as there was no evidence plaintiff ever misused funds or derived any benefit therefrom; and Hughes v. Barnhart, CA No. 03-174-A-1, 2004 U.S. Dist. LEXIS 10096 (M.D. La. May 27, 2004), remanding in part because ALJ did not explore evidence regarding financial obligations plaintiff undertook when he began receiving benefits, e.g., purchase of reliable transportation for his family, which he testified he would not have done had he known he was not entitled to benefits.

3.  *Application of Law to Facts of This Case*:  Given no clear guidance from the Third Circuit Court of Appeals about how broadly we are to interpret the phrase, we conclude that recoupment from Mr. Hoffman would offend equity and good conscience for at least two reasons.  First, we find the ALJ erred as a matter of law in his analysis of the equity and good conscience prong of the waiver test by considering Mr. Hoffman's financial assets, contrary to SSA regulations.  Second, we conclude that the SSA, according to the record, never gave Mr. Kirby complete and clear information about how "substantial work" was determined or how and when income from that activity would be averaged, thereby inducing Mr. Hoffman to continue working under circumstances which resulted in his ultimate detriment.

In his discussion of the second prong of the waiver test, the ALJ concluded that recovery would not be against equity and good

28

conscience for four reasons. First, Mr. Hoffman argued that had he known "he was not entitled to benefits, he would have applied for state funds to pay for his room and board expenses." The ALJ dismissed this argument because there was "no clear evidence that the claimant would have qualified for state funds." Secondly, the ALJ noted that in November 2002, Mr. Kirby stated Mr. Hoffman "was holding sufficient money to repay the overpayment in full . . . and that he preferred to spend down his assets in case he needed to file for medical assistance based on need in the future." (Tr. 26, *citing* Exhibits 5 and 7.) Third, the ALJ found, despite Mr. Kirby's testimony that Mr. Hoffman's current income at the time of the hearing was insufficient to pay his monthly expenses, Mr. Hoffman retained sufficient assets to refund the overpayments and still retain more than enough savings to supplement the monthly shortfall for at least three more years. Finally, he rejected Mr. Kirby's argument that Mr. Hoffman had changed his circumstances for the worse by retiring from his job in 2002; the ALJ concluded that he had stopped working before his full retirement age "because his subsidized employment ended, not because of his dependence on disability insurance benefits or because of any actions by the Social Security Administration." (Tr. 26, *citing* Exhibit 6.)

We agree that the fourth argument - that Mr. Hoffman changed his circumstances for the worse by retiring - is not persuasive for the reasons cited by the ALJ. On the other hand, we conclude that

the ALJ erred in his consideration of Plaintiff's second and third

arguments because in each instance, he relied on the fact that Mr.

Hoffman had other financial resources from which the repayment

could be made. As stated in the regulations, "the individual's

financial circumstances are not material to a finding of against

equity and good conscience."    20 C.F.R. § 404.509(b).    By

discussing Mr. Kirby's previous statements regarding the fact that

even after reimbursing the SSA for the alleged overpayments, Mr.

Hoffman had sufficient funds to supplement his monthly income while

still maintaining his quasi-independent lifestyle for several

years, the ALJ strayed into improper grounds for his conclusion

that recoupment would not be against equity and good conscience.

(See Plf.'s Brief at 4, pointing out that "recovery of overpayment

is solely based on the fact that Mr. Hoffman has finances

sufficient to make recovery of the overpayment possible, thus

violating Social Security's own code.")    Although Defendant

correctly cites the law on this point (Def.'s Brief at 18-19), he

does so only in the context of precluding Plaintiff's argument that

recoupment would reduce his available retirement assets. He fails

to recognize that the ALJ erred in this regard by conflating the

permissible consideration of Plaintiff's assets in evaluating 20

C.F.R. § 404.508 with the impermissible consideration of those

assets in his analysis of 20 C.F.R. § 404.509.[13]

Returning to Plaintiff's first argument — that had he known he was not entitled to benefits, he would have applied to the state for financial support - we conclude that the ALJ erred in finding that there was "no clear evidence" that he "would have qualified for state funds." To the contrary, the record is clear that from the time he was 17 years old, he was supported in a state facility for the mentally retarded at "Ceilings Grove State School" and thereafter transferred to the facility at "Crescent." [14] (Tr. 169.) Although the Court has been unable to determine the source of funds for the facility at Cresson (which has now apparently closed; see Tr. 50), publically available information shows that the Selinsgrove center is supported by the Pennsylvania Department of Public Welfare. See www.dpw.state.pa.us/general/aboutdpw/ dpworganization/odp, last visited October 19, 2007. Moreover, the ALJ noted that the seasonal work for Mr. Hoffman was "subsidized" by the Commonwealth of Pennsylvania. (See Tr. 26, referring to an SSA note dated November 11, 2002, at Tr. 50, commenting that "the

---

[13] We note that in its waiver determination, the SSA committed the same error. (Tr. 76.) In a single paragraph, the SSA mentions Mr. Hoffman's savings and certificate of deposit, then concludes, "Recovery of the overpayment would not defeat the purpose of Title II nor would it be against equity and good conscience." There is no recognition that the latter prong of the waiver test requires a different analysis.

[14] The Court assumes the stenographer at the hearing intended a reference to the residential centers for the mentally handicapped located at Selinsgrove and Cresson, Pennsylvania, respectively.

state decided not to support this [program] any longer.")
Moreover, Mr. Kirby referred specifically to "county programs for
room and board" or use of "a volunteer to provide living
arrangements." (Tr. 175-176.) Plaintiff's ability to qualify for
state support was therefore not entirely theoretical or
speculative. It seems inequitable for the ALJ to have concluded
there was insufficient evidence of Mr. Hoffman's right to qualify
for state support when he failed to ask Mr. Kirby to provide such
evidence. As at least one court has noted, in light of the Supreme
Court's holding that the ALJ has a "duty to investigate the facts
and develop the arguments both for and against granting benefits,"
it would seem proper to apply that admonition to the question of
recoupment as well. Setian v. Apfel, 110 F. Supp.2d 24, 27-28 (D.
Mass. 2000), quoting Sims, 530 U.S. at 111.

     As to the second reason for our conclusion that requiring
repayment would be against equity and good conscience, it appears
clear from the record that Mr. Kirby understood Mr. Hoffman's gross
earnings would be averaged over a 12-month year and that his income
from seasonal employment would not, therefore, rise to the level of
"substantial work." (See testimony at Tr. 178-179; Plf.'s Brief at
2.) According to Social Security records (Tr. 40), Mr. Hoffman
earned the following amounts during the years in which he received
alleged overpayments; the Court has calculated the average monthly
income based on a 12-month year.

| YEAR | TOTAL INCOME | AVERAGE MONTHLY INCOME |
|------|-------------|------------------------|
| 1994 | 7,729.14 | 644.10 |
| 1995 | 3,552.22 | 296.02 |
| 1996 | 4,073.74 | 339.48 |
| 1997 | 4,790.38 | 399.20 |
| 1998 | 5,450.20 | 454.18 |

As noted above, on June 17, 1994, Mr. Hoffman was advised that his trial work period as a dishwasher had been completed. The SSA stated, "we find that the work which has been done is not substantial work."[15]  (Tr. 14.)  He was told that after his TWP,

_____

[15]  Although nothing in the record supports this hypothesis, it is *possible* that when it reached this conclusion, the SSA may have been considering the provisions of 20 C.F.R. § 1573(c) which describe "special conditions," i.e., work which takes into account the recipient's impairment.  Included among the conditions are special assistance from other employees, permission to work irregular hours or take frequent rest periods, use of special equipment, work which is especially suited to the impairment, or working at a lower standard of productivity than other employees.  The SSA may find that the individual does not have the ability to do substantial gainful activity when work is performed under such conditions.  In this case, the relevant special condition appears to be described as "You were able to work only because of specially arranged circumstances, for example, other persons helped you prepare for or get to and from your work."  20 C.F.R. § 1573(c)(4); *see also* Tr. 173 describing special conditions of Plaintiff's work at resorts.  However, it appears from the record that the SSA never explained this provision to Mr. Hoffman, and there is no evidence that it was taken into consideration in the SSA's determination that his seasonal work at the resorts after the TWP was substantial.  Nor did the ALJ consider this point in his analysis.  *See* Goldstein v. Harris, 517 F.Supp. 1314, 1317 (S.D. N.Y. 1981) ("Earnings in excess of the specified amounts do not preclude a finding of disability, but merely create a rebuttable presumption of substantial gainful activity.  The ALJ must also consider the nature of the work performed, the adequacy of performance, any special employment conditions, and the amount of time spent working.")  *See also* 20 C.F.R.§ 1592 describing the trial work period.

33

your right to monthly payments will still continue if you
are disabled and your average earnings are not over. . .
$500 a month. . . .If your average earnings are more than
these amounts, we call your work substantial and we will
stop your monthly payments.

(Tr. 15.)

On November 9, 1997, Mr. Hoffman was told that he had been
overpaid between April and October 1994 in the amount of $3,136.70
because he had performed "substantial work" during that period.
(Tr. 121.)[16]  However, the concept of substantial work was not
discussed or defined in that letter. When Mr. Kirby received this
letter, it is not surprising that he agreed with the determination
that Mr. Hoffman had received excess benefits because, as shown in
the chart above, Plaintiff's total income for 1994, averaged over
12 months, was greater than $500 a month, i.e., $644.10. Based on
the information Mr. Kirby had received in June 1994 regarding
"substantial work" and "averaging," a reasonable person in his
place would have concurred with the SSA's demand that the benefits
paid during seven months in 1994 should be returned.

On April 8, 1998, when advising Plaintiff that the SSA
believed he had performed substantial work during the period March
through September 1994, July through October 1995, and June 1996
"and later," the SSA wrote, "[U]sually, we find that work is

---

[16] This letter refers to earlier correspondence in which the SSA
"wrote to tell [Mr. Kirby] that we have new information about MR.
HOFFMAN'S work and earnings that could affect his payments." (Tr.
121.) The Court has been unable to identify in the record any letter
dated between June 1994 and November 1997.

substantial if gross earnings average over $500 a month after we deduct allowable amounts."   (Tr. 126.)[17]   When he received this letter, particularly the information about recoupment of benefits paid in 1995 and 1996 when Plaintiff earned a monthly average of $296.02 and $339.48, respectively, Mr. Kirby reasonably questioned how the SSA determined that benefits should not have been paid when the SSA itself had stated that substantial work usually depends on a finding that average earnings are greater than $500 a month.

The record shows that after this point, Mr. Kirby made numerous attempts to resolve this situation with the SSA (Tr. 107-109), but there is no evidence that anyone ever explained the relevant regulation to him.  In fact, in the March 11, 1999 letter which purportedly responds to Mr. Kirby's inquiry, the SSA provides no such explanation but merely stated that Mr. Hoffman had been paid $15,590 too much for the period January 1991 through December

---

[17]  Mr. Hoffman also received a letter on December 24, 1997, advising him about the withholdings that would be made from his benefits beginning in January 1998.   Attached to that letter was a form document stating:  **"How Your Work And Earnings Affect Your Benefits.**  Your work will only affect your Social Security benefits if your total earnings are over the limits we show below.  . . . Annual Limit for 1997:  Under age 65 - $8,640 . . . . If you earn over the annual limit, $1 will be withheld from your benefits for each $2 of earnings (under age 65) . . . above the annual limit."  (Tr. 123.) This information appears to have no relationship to the concept of "substantial work" being based on the monthly average earned and, in addition, was a form document on which Plaintiff could not justifiably rely.  *See* Valley v. Comm'r of Soc. Sec., 427 F.3d 388, 393 (6th Cir. 2005) (recipient could not reasonably rely on form letters sent with benefit checks as an explicit or specific interpretation of the Social Security Act or SSA regulations.)  However, the notice would have reinforced Plaintiff's reasonable perception that the seasonal work from which he earned far less than $8,640 a year was not substantial.

35

1995, once more creating confusion rather than clarity. (Tr. 132.)

Although the ALJ did not discuss this point at the hearing nor mention Mr. Kirby's understanding in his opinion, the Social Security Appeals Council finally pointed out in December 2006:

> According to 20 C.F.R. 404.1574a, if an individual's work as an employee was continuous without significant change in work patterns or earnings, and there has been no change in the substantial gainful activity earnings levels, earnings will be averaged over the entire period of work requiring evaluation to determine if the individual has done substantial gainful activity. Your [i.e., Mr. Hoffman's] work activity was not continuous so your earnings may not be averaged.

(Tr. 3.)

A reasonable person receiving a letter like that of June 17, 1994, stating that the SSA does not consider work to be substantial - and therefore not a bar to receiving benefits - if the "gross earnings average over $500 a month" would rationally assume "average" meant total income divided by twelve months, unless he was provided with other information to the contrary. There is no evidence, however, that Mr. Hoffman was ever advised that in SSA parlance "average" means "average under certain conditions" until well after he had relied on the June 1994 letter and continued to work at a job which provided him in five or six months with a level of income which precluded him from receiving DIB for those months, even though his total annual income was far below the $6,000 threshold which would have applied had he worked year round.

The SSA concedes that Mr. Hoffman kept the SSA apprised each

time he returned to work, a fact which is substantiated by its own records for the period 1992 through June 1998 showing his income by month. (Tr. 42-43.) The SSA noted in response to an inquiry by Mr. Hoffman's Congressman that "Mr. Kirby made reasonable attempts to notify Social Security when Mr. Hoffman entered and left the workforce, as the law requires. They simply assumed that, since Mr. Hoffman's checks continued to arrive after they made their reports, he must be due them and continued to cash the checks." (Tr. 157.)[18]

Again, the Court finds that assumption to have been reasonable. From 1994 through 1998, Mr. Hoffman performed exactly the same type of work, under exactly the same highly supportive living and working conditions, during the same five or six month seasonal time-frame as he had done during his TWP. (Tr. 109.) The SSA had advised him "the work which has been done is not substantial" (Tr. 14), but did not explain why. Based on the content of the June 17, 1994 letter and the fact that Plaintiff advised the SSA each time he returned to work under those conditions without objection by the SSA, it was not unreasonable

_____

[18]  The Court notes in passing that the SSA's statement of the law regarding recoupment in this letter is, at best, incomplete. The District Manager for the SSA wrote, "For us to be permitted to waive recovery of the debt, Mr. Hoffman must be both without fault in causing the overpayment and unable to repay the debt." (Tr. 158.) As discussed in the text above, a claimant's financial ability to repay "the debt" plays no role in consideration of the "against equity and good conscience" prong of the analysis.

37

for him to have concluded that the type of work he continued to perform was not substantial. Moreover, although the SSA told him "we will stop your monthly payments" if it found Mr. Hoffman's work was substantial based on average earnings of more than $500 a month, those payments never stopped in a timely manner and, according to the record provided, Mr. Kirby was never advised that an alternative would be for the SSA to seek recoupment more than three years after the fact, while Mr. Hoffman unknowingly continued to accrue more erroneously provided benefits.

Social Security regulations provide that when an individual accepts an overpayment

> because of reliance on erroneous information from an official source within the Social Security Administration . . . with respect to the interpretation of a pertinent provision of the Social Security Act or regulations pertaining thereto. . . such individual, in accepting such overpayment, will be deemed to be without fault.

20 C.F.R. § 404.510a.

Furthermore, 20 C.F.R. § 404.512(a) states: "in the situations described in. . .§ 404.510a, adjustment or recovery will be waived since it will be deemed such adjustment or recovery is against equity and good conscience." *See* Gladden v. Callahan, 139 F.3d 1219, 1223 (8th Cir. 1998) (finding recoupment would inequitable where claimant relied on erroneous advice from the ALJ that "we don't insist that you work unless you're capable of what they call substantial gainful activity . . . in other words can you work eight hours a day 40 [hours] a week"); Coulston v. Apfel, 224 F.3d

897, 902 (8ᵗʰ Cir. 2000)("A claimant's reliance on agency representations *automatically* establishes that repayment would offend equity and good conscience" (Bye, J., concurring, emphasis in original)); and Priolo v. Secretary of HHS, 645 F.Supp. 39, 43 (E.D. N.Y. 1986) (remanding in part because ALJ did not inquire into claimant's reliance on erroneous information by an SSA employee, thus bringing into play 20 C.F.R. § 404.512(a).)

Moreover, we find this case distinguishable from Valley v. Comm'r of Soc. Sec., 427 F.3d 388 (6ᵗʰ Cir. 2005). There, like the plaintiff in Gladden, the claimant argued he had relied on erroneous information from the SSA. The district court found that the documents on which he purportedly relied were "obviously form letters" which simply notified him of the amount of benefits he would receive. Id. at 393. Herein, while the June 1994 letter may have included some form paragraphs, it also included other information specific to Mr. Hoffman's case, e.g., the months in which his TWP had been performed and the SSA's conclusion that the work he had done was not substantial. Thus, as in Gladden, "an official source within the Social Security Administration" provided "interpretation of a pertinent provision of the Social Security Act or regulations pertaining thereto," thereby bringing this case within the purview of 20 C.F.R. § 404.512(a).

We therefore conclude that under all the facts and circumstances of this case, recoupment of the alleged overpayments

39

to Mr. Hoffman in 1994 through 1998 would be against equity and good conscience.

      4. *Expedited Reinstatement:* At the hearing, Mr. Kirby stated:

> There is one other consideration that I haven't [spoken] of. But from a recent experience of another individual who in . . . similar circumstances was forced into retirement. He received, without asking, expedited reinstatement and because his income was below the present . . . substantial gainful activity standards, he was given a look back of five years. Found to be eligible to have received Social Security disability income through those five years, had he known and applied for Social Security, but was given a year back pay. Mr. Hoffman wasn't given this opportunity and from the information I'm able to determine would have been also eligible for the maximum of . . . one year back pay. Which both influence the amount of money he has to pay back or enhance his retirement years.

(Tr. 178.)

In his opinion, the ALJ noted:

> The claimant's allegation that he was entitled to more benefits than he received when he refiled is . . . beyond the scope of this hearing. However, a review of the records shows that the claimant received all the benefits to which he was entitled based on the date he refiled for benefits and the onset of disability he alleged.

(Tr. 26.)

On appeal, Mr. Hoffman was advised:

> You contend that expedited reinstatement should have been used rather than a new application because it provides twelve months retroactivity. Pursuant to 20 C.F.R. 404.621(a), an application for disability insurance benefits provides twelve months retroactivity. However, retroactivity was not an issue because you filed your application within twelve months of the date you ceased working.

40

(Tr. 3.)

Although we find it disappointing that neither the ALJ's opinion, which cites no law for his conclusion, nor the Appeals Council's statement clearly explains the relevant SSA regulations to a layperson such as Mr. Kirby,[19] we agree with the ALJ that the question of when Plaintiff's benefits should have started when he refiled for disability on November 8, 2002, was beyond the scope of the hearing.

When Mr. Kirby requested the hearing on August 17, 2005, he indicated he was seeking reconsideration of the decision by the SSA that waiver should be denied. (See Tr. 70-71.) He explicitly stated he disagreed with that decision because "there is an argument against equity and good conscience" and indicated that his claim pertained to "Title II overpayment." (Tr. 83.) In an addendum to the request for a hearing, he wrote that he was requesting review of "the enclosed determination" and that at the hearing he would advance arguments seeking to "either waive overpayment or reduce adjustment to his monthly SSA benefits on repayment efforts." (Tr. 85.)

Nothing in the record indicates Mr. Kirby raised this subject with anyone at the SSA prior to his testimony at the hearing. Consequently, the SSA had not made a decision on whether Mr.

---

[19] We believe the SSA should have also directed Mr. Kirby's attention to 20 C.F.R. §§ 404.1592b through 404.1592f where the concept of expedited reinstatement is explained.

Hoffman was eligible for expedited reinstatement or not. Therefore, we are compelled to conclude that Plaintiff failed to exhaust his administrative remedies on this issue and, as the ALJ found, the subject was outside the scope of the hearing held on June 19, 2006.

## V.   FURTHER PROCEEDINGS

"A district court, after reviewing the decision of the Commissioner, may under 42 U.S.C. § 405(g) affirm, modify, or reverse the Commissioner's decision with or without a remand to the Commissioner for a rehearing." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 549 (3d Cir. 2003). Mr. Hoffman seeks either a ruling from this Court that recovery should be waived or a remand for further consideration by the Commissioner.

Plaintiff was first advised almost exactly ten years ago, on November 9, 1997, that he had been overpaid more than three years before that. Based on the information he had previously been provided, Mr. Hoffman did not dispute this overpayment and agreed that it should be reimbursed. The SSA stopped those reimbursement payments without explanation in July 1998. Despite Mr. Kirby's attempts to clarify the situation after he was advised in July 1998 of the additional alleged overpayments, the Administration failed to clearly explain its reasoning, provided inconsistent and unsubstantiated calculations, and did not pursue recovery of the overpayments for more than four years. As the Third Circuit Court

42

of Appeals has stated, where a case is beset with "considerable
inexplicable delays" not of the claimant's making, the Court may
award benefits directly "when the administrative record of the case
has been fully developed and when substantial evidence in the
record as a whole indicates that the claimant is disabled and
entitled to benefits."  Morales v. Apfel, 225 F.3d 310, 320 (3d
Cir. 2000), quoting Podedworny v. Harris, 745 F.2d 210, 222 (3d
Cir. 1984).

We conclude this is an instance in which benefits may be
"awarded" by waiving repayment without further consideration by the
ALJ or development of the record.  We therefore deny Defendant's
motion for summary judgment and grant Plaintiff's motion seeking to
reverse the Commissioner's decision of September 27, 2006.  We
remand to the Commissioner for the sole purpose of refunding to
Plaintiff all monies which have been withheld from Plaintiff's
disability insurance benefits or otherwise recouped from him at any
time between January 1998 and the date of this decision.

An appropriate order follows.

October  2 3, 2007

William L. Standish
United States District Judge

cc:  Charles Hoffman, pro se
     c/o Joseph R. Kirby
     1161 Gates Hill Road
     Summerhill, PA 18958

43

John J. Valkovci, Jr.
United States Attorney's Office
319 Washington Street
Room 224, Penn Traffic Building
Johnstown, PA 15901
Email: john.valkovci@usdoj.gov